WESTERN PRINTING & LITHOGRAPHING COMPANY, Appellant, vs. INDUSTRIAL COMMISSION and another, Respondents.

*November 5—December 4, 1951.*

For the appellant there was a brief by *Brach & Edwards,* and oral argument by *Oscar M. Edwards* and *Fred W. Wheeler,* all of Racine.

*Austin T. Thorson* and *Arnold J. Spencer,* both of Madison, for the respondent Industrial Commission.

CURRIE, J.   The Wisconsin Unemployment Compensation Act embraced in ch. 108, Stats., was originally enacted in 1932, and sec. 108.04 (5) (b), Stats., thereof provided that an employee should not be eligible for benefits "if he has left his employment voluntarily without good cause attributable to the employer." From the date of original enactment of the act in 1932, down to the time the act was amended by ch. 354, Laws of 1945, the only situation in which an employee was eligible for unemployment compensation benefits

under the act in the event of a voluntary termination of employment, was that wherein the employee terminated his employment as a result of cause attributable to the employer.

The preamble to the act containing the public-policy declaration which prompted its enactment is to be found in sec. 108.01, Stats., and contains the following statements of policy:

". . . Each employer's contribution rate should vary in accordance with his own unemployment costs, as shown by experience under this chapter. . . .

". . . *A sound system of unemployment reserves, contributions, and benefits should induce and reward steady operations by each employer,* since he is in a better position than any other agency to share in and to reduce the social costs of his own irregular employment. . . ."

In other words, the theory of the act was to allow benefits only in those situations wherein the unemployment resulted from some act or omission of the employer. Unlike the Unemployment Compensation Acts of many of the other states, each Wisconsin employer has his own individual reserve account to which his contributions are credited and from which disbursements for benefits are debited. Employers who are able to stabilize the employment of their employees and prevent unemployment are rewarded by having their contributions decreased or eliminated when a certain reserve has been built up.

Permitting an employee to be eligible to receive benefits as a result of a voluntary quitting of employment due to good cause attributable to the employer was in keeping with the declaration of policy enunciated in sec. 108.01, Stats., because it was within the power of an employer not to produce a cause which would justify the employee in quitting his employment.

However, the amendments to the act embodied in ch. 354, Laws of 1945, introduced features into the act in connection

with voluntary termination of employment that were entirely foreign to the spirit of the policy declaration of sec. 108.01, Stats., in that an employee was made eligible for benefits in certain cases of voluntary quitting of employment under circumstances wherein the employer had no control over the situation whatsoever, and was powerless to prevent such circumstances from arising. These new provisions introduced into the act, as a result of the 1945 amendments, are to be found in sec. 108.04 (7), Stats. 1945, reading as follows:

"(7) *Voluntary termination of employment.* (a) If an employee terminates his employment with an employer, he shall be ineligible for any benefits based on such employment, and ineligible for benefits based on other previous employment for the week of termination and the four next following weeks, except as hereinafter provided.

"(b) Paragraph (a) shall not apply if the commission determines that the employee terminated his employment with good cause attributable to the employer.

"(c) Paragraph (a) shall not apply *if the commission determines that the employee terminated his employment for compelling personal reason; provided that, if the commission determines that he is physically unable to work or substantially unavailable for work, he shall be ineligible while such inability or unavailability continues.*

"(d) Paragraph (a) shall not apply if the commission determines that the employee terminated his employment to take another job; provided, that he shall be ineligible, for benefits based on the employment terminated, until he has been employed within at least seven subsequent weeks."

These 1945 amendments were enacted as the result of recommendations made to the legislature by the advisory committee on unemployment compensation created by the commission pursuant to sec. 108.14 (5), Stats., the members consisting of an equal number of representatives of employers and employees, with a salaried commission employee as chairman. The advisory committee submitted an explanation to

the legislature of the changes recommended, and such explanation given with respect to the changes relating to voluntary termination of employment read as follows:

"The present provision relating to disqualification of employees who leave their employment (108.04 (4) (b)) would be repealed by sec. 6 of 303, S. A modified provision on the same subject would be created, as 108.04 (7), under the subsection heading 'Voluntary Termination of Employment.'

"The existing provision of the law cancels an employee's benefit rights as to his last employer except in those cases in which the employee's termination was with good cause attributable to the employer. To so disqualify employees, without reference to the reasonableness of their conduct in terminating their employment, has been demonstrated by experience to be both inequitable and out of accord with the general basic purposes of an unemployment compensation program. It seems altogether clear that a person who is compelled to terminate his employment because of personal reasons should have a different treatment provided than another person who terminates his employment for no good reason whatsoever.

"Paragraph (c) of the proposed new subsection provides that an employee's eligibility for benefits is not affected by reason of having terminated his employment because of *compelling personal reason.* However, it is further provided that if his 'compelling reason' is such that he is unable to work or unavailable for work, he is not to receive benefits while such inability to work or unavailability for work continues.

"It is to be noted that the phrase *compelling personal reason* is not to be found in existing Unemployment Compensation Acts, or, for that matter, in any statute of which your advisory committee has knowledge. It must be interpreted by the commission, in the first instance, and by the courts, in the last analysis. However, the committee, in its deliberations, considered that the phrase *compelling personal reason* had reference to situations in which it would be unreasonable to expect an employee, because of personal circumstances, to continue his job. It is felt that this test of reasonableness is the one to be properly applied in this type case."

In interpreting sec. 108.04 (7) (c), Stats., in cases coming before it, wherein it was contended by the employee seeking the payment of benefits that he or she quit for a *compelling personal reason,* the commission embarked upon uncharted waters because no other state Unemployment Compensation Act contained a similar provision.

Sec. 108.02 (21), Stats., for some years has provided as follows:

"(21) *Undefined terms.* Any word or phrase used in this chapter and not specifically defined herein shall be interpreted in accordance with the common and approved usage thereof and in accordance with other accepted rules of statutory construction. No legislative enactment shall control the meaning or interpretation of any such word or phrase, unless such enactment specifically refers to this chapter or is specifically referred to in this chapter."

The interpretation of the term *"compelling personal reason"* adopted by the commission, as set forth in its brief in this case, and which we understand it has applied in the prior cases which have been decided by it wherein the employee claimed benefits as a result of quitting for a *compelling personal reason,* is as follows:

"The commission construes *'compelling personal reason'* to be such a reason as would impel the same or similar action by an ordinary reasonable individual under the same or similar circumstances.

" *'Compelling personal reason'* requires considerations or motives which leave a claimant no reasonable alternative but to terminate his employment. It exists only when, because of his personal circumstances, it would be unreasonable to expect an employee to continue in his job."

This interpretation of the commission in effect adopts the "reasonable man" test as a standard. This is a well-known legal concept that has been widely used as a standard in negligence cases.

It was only natural that there should have been widespread opposition on the part of employers to the provision imported into the act by the 1945 amendments which permitted an employee to be entitled to benefits who had voluntarily quit his or her job for *"compelling personal reason,"* as thus interpreted by the commission, because employers' reserve accounts were diminished in paying such claims and employers were powerless to prevent the circumstances from arising which gave rise to such benefit liability. The legislative council committee on labor, industry, small business, and commerce, submitted a report to the 1951 legislature in which it stated with respect to this provision in the act relating to *"compelling personal reason"* as follows:

"Considerable objection was raised to the payment of benefits to employees who quit their job for a 'compelling personal reason,' also without fault of the employer. For example, an employee's husband leaves the state,—goes to Arizona for reasons of health. His wife desires to join him and quits her job. She is unable to find work at the new location and collects benefits from her Wisconsin employer. Here again the employer does not feel that his reserve account should be penalized for unemployment not initiated by him.

"The committee concluded that benefits paid under the compelling-personal-reason doctrine should be charged against the balancing account, since the number of cases and amount involved is negligible.

"The committee suggested that the rules and policies governing the compelling-personal-reason doctrine be more clearly established and that there be closer supervision of the employee's availability for work in such cases. A recent decision of the commission, case No. 50—C—543, is of considerable value as a guide for future cases. The compelling-personal-reason doctrine is so broad, and such a wide range of cases came up under it, that real difficulties are presented to the people making decisions."

The statement in such report of the legislative council, that considerable objection had been raised to the payment of

benefits to employees who quit their jobs for a compelling personal reason, was based upon information gained at public hearings which the committee had held in various Wisconsin cities.

The 1951 legislature thereupon adopted ch. 532, Laws of 1951, which among other things, amended sec. 108.04 (7), Stats., by adding a new paragraph (e) reading as follows:

"(e) Any benefits paid pursuant to paragraph (c) or (d) based on the employment terminated shall be charged against the fund's balancing account; but the employer shall continue to be recognized as an interested party in any such case."

It is significant that paragraph (c) of sec. 108.04 (7), Stats., was left unchanged. Case number 50—C—543, referred to in the committee report, is a decision rendered by the commission under date of October 30, 1950, wherein the commission adopted the same definition and interpretation of the words *"compelling personal reason"* as previously set forth in this opinion. The conclusion therefore is inescapable, as to legislative intent, that the legislature must have been satisfied with this interpretation which the commission had placed upon the words *"compelling personal reason"* because no change was made in the clause giving rise to benefits in those cases where an employee voluntarily quit his job for such reason. However, realizing that making employers' reserve accounts liable for the payment of such benefits was not in keeping with the policy declaration contained in sec. 108.01 that "contributions and benefits should induce and reward steady operations by each employer" the legislature did amend the act so as to provide that the benefits in this type of case should not be charged to individual employers' reserve accounts, but instead should be charged to the "balancing account."

The so-called "balancing account" is a fund which the commission is required to maintain under the provisions of

sec. 108.16 (6), Stats., and the sources of such fund are net earnings belonging to the fund, certain reimbursements, any balance credited to an employer's account when he ceases to be subject to the chapter (except as provided in sec. 108.16 (8)), the amount of any benefit checks which are not presented for payment within one year, and amounts transferred from employer accounts pursuant to sec. 108.16 (12). Sec. 108.16 (12) provides for levying a *pro rata* assessment against all employers' reserve accounts for the benefit of the balancing account, if the latter account decreases below a certain figure.

In view of the legislative intent, as gathered from the foregoing history of the statute involved, which imports approval by the legislature of the commission's interpretation of the term *"compelling personal reason,"* and such interpretation being consistent with the expressed wording of the statute itself, this court feels compelled to accept such interpretation.

Applying the commission's interpretation of *"compelling personal reason"* to be "such a reason as would impel the same or similar action by an ordinary reasonable individual under the same or similar circumstances . . . [and] requires considerations or motives which leave a claimant no reasonable alternative but to terminate his employment;" we come to the same conclusion, as did the learned trial court, that the employee in this instance, in quitting her job at the insistence of her parents that she accompany them to their new home in California, did so for a *"compelling personal reason."* Being an unemancipated minor it was her duty to obey the command of her parents.

The decision of the trial court and the briefs of the parties on this appeal are replete with decisions of the courts of other states wherein the Unemployment Compensation Acts of these other states have been interpreted with respect to a voluntary quitting of employment. However, none of the

statutes of these other states contain a provision, such as that contained in sec. 108.04 (7) (c), Stats., using the term *"compelling personal reason,"* and therefore we can see no benefit in citing, reviewing, or distinguishing any of such decisions in this opinion.

In addition to the contention that the claimant employee in this instance did not quit her job for compelling personal reason, the further question is raised that she was *"substantially unavailable for work"* within the meaning of sec. 108.04 (7) (c), Stats., because of being out in California at the time of registering for work and applying for benefits. Among other authorities cited on this point by appellant is the case of *Walton v. Wilhelm* (1950), 120 Ind. App. 218, 223, 91 N. E. (2d) 373, wherein it was stated:

"We think availability involves an actual attachment to the labor force. A good faith offering of the claimant's services is a prerequisite to availability. Exposure to the labor market must be sincere and unequivocal. A professed willingness to work, accompanied by or following conduct wholly inconsistent therewith will not serve to establish availability. Good faith cannot exist independently of honest intention.

"We have repeatedly said the law was not designed for the benefit of those who are voluntarily idle. It was intended to alleviate the distressing consequences of involuntary unemployment. It is for the relief of those unemployed through no 'fault' of their own. While meritorious claims should not be denied, the humane purposes of the act should not be perverted by pretense. . . .

". . . He cannot be considered to be unemployed through no 'fault' of his own if he leaves an area where suitable employment is available, and goes to another location for recreational purposes or because of domestic obligations, wholly disassociated from any interest in the existence of work opportunities there."

The state of Ohio in the case of *Brown-Brockmeyer v. Holmes* (1949), 152 Ohio St. 411, 89 N. E. (2d) 580, has

held that an employee is not available for work when he has removed to a location outside the state of Ohio. There are decisions of courts of other jurisdictions holding to the contrary.

The commission, in support of the contention that the employee in this instance was not unavailable for work, relies on the provisions of sec. 108.14 (8), Stats., enacted in 1937, which, ever since 1941, has provided as follows:

"(a) The commission may enter into administrative arrangements with any agency similarly charged with the administration of any other Unemployment Compensation Law, for the purpose of assisting the commission and such agencies in paying benefits under the several laws to employees while outside their territorial jurisdictions. Such arrangements may provide that the respective agencies shall, for and on behalf of each other, act as agents in effecting registration for work, notices of unemployment, and any other certifications or statements relating to an employee's claim for benefits, in making investigations, taking depositions, holding hearings, or otherwise securing information relating to coverage or contribution liability or benefit eligibility and payments; and in such other matters as the commission may consider suitable in effecting the purpose of these administrative arrangements.

"(b) The eligibility of an employee with respect to a benefit claim (based on past credit weeks under this chapter) may be established through arrangements authorized in this subsection, and he shall then be paid the benefits due him under this chapter."

During the ten-year period from 1940 through 1949, thirty-five thousand seven hundred fourteen initial claims, and one hundred sixty-six thousand three hundred thirty-five continued claims have been filed under the Wisconsin act by employees then outside the state. In administering these claims the commission has entered into reciprocal arrangements with other states whereby the former Wisconsin employees report weekly for work to employment offices in such

other states. With this history of practical administration of sec. 108.14 (8), Stats., before it, the legislature has seen fit to make no change in the statute. We are therefore of the opinion that such practical interpretation by the commission of this statute for many years is in accord with the legislative intent which prompted the original enactment of such statute.

The claimant employee in this instance did register for work weekly at the office of the department of employment at Alhambra, California, pursuant to a reciprocal arrangement entered into between the Wisconsin Industrial Commission and the California department of employment, and we must hold that she was not *"substantially unavailable for work"* during the time she so reported to such office in California.

*By the Court.*—Judgment affirmed.